## Renk v. HealthAmerica Corp.

C.P. of Allegheny County, nos. GD 97-11697, GD 97-11699.

*Neil R. Rosen,* for plaintiffs.

*Deborah D. Olszewski,* for defendant HealthAmerica.

*Giles Gaca,* for defendants Ganti and Penn Group Medical Associates.

FRIEDMAN, *J.,* December 19, 2000—

## INTRODUCTION

Defendants HealthAmerica Corporation of Pennsylvania, d/b/a HealthAmerica, Penn Group Medical Associates, and Murty S. Ganti M.D. have filed post-verdict motions asserting a variety of errors by the court. The plaintiffs have filed a motion to mold the verdict and to add delay damages.

The case involves allegations of negligence, in particular the failure of Dr. Ganti to perform a screening test which allegedly led to a belated diagnosis of colon cancer. The delay in diagnosis was said to have greatly increased Mr. Renk's risk of premature death and also to have subjected him to much more drastic treatment measures than would otherwise have been necessary.

In addition to the law of negligence, the case also involves the law of contracts. Defendant HealthAmerica had made specific contractual promises to Mr. Renk (as one of its many customers/clients/insureds) regarding the performance of necessary screening, inter alia, as part of the preventive medicine component of its health maintenance program which was the subject of its contract with Mr. Renk.

## ISSUES RAISED BY DEFENDANTS' MOTIONS

Many of the issues raised by HealthAmerica, Dr. Ganti and Penn Group are similar. Those issues may be grouped together as follows:

(1) *Whether the court erred in directing a verdict against Dr. Ganti on the issue of negligence.*

"The court erred in granting plaintiff's motion for directed verdict on the issue of colorectal screening/sigmoidoscopy." (Ganti/Penn Group issue 1.)

"The trial erred in directing a verdict against Dr. Ganti based solely on Dr. Ganti's oral testimony given at trial." (HealthAmerica issue (a).)

"The court erred in refusing to submit the issue of Mr. Renk's negligence to the jury." (Ganti/Penn Group issue 4 and HealthAmerica issue (c).)

"The court erred after directing a verdict against Dr. Ganti on negligence in submitting to the jury, at the request of plaintiff's attorney, a verdict slip question 2 and 3." (Ganti/Penn Group issue 5.)

"The trial court erred in submitting to the jury the issue of negligence of Dr. Ganti for only one visit, after the court had improperly directed a verdict against Dr. Ganti on the issue of negligence." (HealthAmerica issue (h).)

(2) *Whether the court erred in striking portions of Dr. Kuhns' testimony by videotape deposition.*

"The court erred in striking portions of the video deposition of Dr. Kuhns." (Ganti/Penn Group issue 2.)

"The trial court erred in excluding portions of Dr. Kuhns' testimony on the knowledge that Mr. Renk had of HealthAmerica's guidelines on the availability and

advisability of colorectal cancer screening and yearly physicals, as well as the issue of Mr. Renk's contributory negligence for not making an appointment for a comprehensive physical at the age of 50." (HealthAmerica issue (b).)

(3) *Whether the court erred in refusing to admit HealthAmerica magazine articles to prove Mr. Renk's contributory negligence.*

"The court erred in refusing admission of Health-America journals offered by Defendants for the purpose of showing Mr. Renk's knowledge and negligence." (Ganti/Penn Group issue 3.)

(4) *Whether the court erred in charging the jury on the life expectancy tables as to Mr. and Mrs. Renk.* (Ganti/Penn Group issue 6 and HealthAmerica issues (i) and (j).)

The following issues were raised only by the party indicated.

(5) *Whether "[t]he court erred in permitting plaintiffs to call Mr. Lauritzen on rebuttal."* (Ganti/Penn Group issue 7.)

(6) *Whether "[t]he trial court erred in excluding the testimony of Dr. John Durocher on the growth rate of tumors."* (HealthAmerica issue (f).)

(7) *Whether "[t]he trial court erred in failing to charge the jury on the issue of the Two Schools of Thought Doctrine as testified to by Dr. Richard Bruehlman."* (HealthAmerica issue (g).)

(8) *Whether "[t]he verdict was excessive because of the errors committed above which created an unfair and prejudicial atmosphere for jury deliberations."* (HealthAmerica issue (k).)

# DISCUSSION

## (1) *The Court Was Not in Error for Directing a Verdict on the Issue of Dr. Ganti's* Negligence *While Still Permitting the Jury To Decide the Issue of* Causation

The court expressly told the jury that they would *not* have to decide whether or not Dr. Ganti was negligent, but that they *would* have to decide whether or not Dr. Ganti's admitted[1] negligence *caused* the damages plaintiffs claim to have suffered. The jury were also asked to consider whether or not HealthAmerica was *directly* liable to plaintiffs (based on allegedly inadequate operating procedures and policies given the promises it had made). It was undisputed that HealthAmerica was *vicariously* liable for any harm Dr. Ganti's negligence may have caused, so the question of vicarious liability was not submitted to the jury.

The defendants all contend that directing the jury on the issue of Dr. Ganti's negligence was erroneous and somehow confusing since causation was not also directed.[2] The court does not agree at all. Juries are perfectly capable of understanding the differences and interrelationships among the concepts of negligence, causation, and liability. Furthermore, as was the case here,

---

1. His admissions are found at TT vol. II, p. 98, l. 20 to p. 99, l. 1; TT vol. II, p. 116, l. 22 to p. 117 l. 14. Furthermore, the evidence from all parties, not just Dr. Ganti himself, overwhelmingly supported the conclusion that the failure to refer Mr. Renk for a routine screening sigmoidoscopy at age 50 was *negligent.*

2. Dr. Ganti carried most of the argument on this point during the discussion of the court's charge.

juries are routinely told in *every* negligence case that a negligent act does not, alone, result in liability. In addition, as was the case here, juries are not usually asked to answer questions on a fact that is not in dispute, whether the lack of dispute is based on an agreement of counsel or on an admission by a defendant in open court.

In objecting to the instruction as to negligence, counsel for Dr. Ganti argued that, since Dr. Ganti's admission was elicited on cross-examination, it is not really an admission. (TT, vol. II, p. 148, ll. 21-23.) Were this the case, there would be no reason to ever allow cross-examination, the ultimate purpose of which is to elicit admissions that what was said on direct was less than accurate.

Dr. Ganti also argued that oral testimony cannot be a basis for a directed verdict. That may be a correct statement about *testimony*,[3] but it is not applicable to an oral *admission* by a party. Dr. Ganti's admission that he did a certain act coupled with his additional admission that it was negligent for a doctor to have so acted, leaves no *disputed* issue of *negligence* for the jury to decide.

---

3. *Nanty-Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932) was a case in which the trial directed a verdict for the plaintiff based upon oral testimony of witnesses. The Supreme Court reversed, holding that judgment may not be granted summarily by the court based solely on oral testimony because the credibility of witnesses, even if uncontradicted, is for the jury.

*Nanty-Glo* did *not* involve an *admission* by a *party*. The *Nanty-Glo* rule has since been limited as it applies to motions for summary judgment. *Ertel v. Patriot-News Co.*, 544 Pa. 93, 674 A.2d 1038 (1996). In *Ertel,* the Supreme Court held that the non-moving party, when countering a motion for summary judgment, must come forward with sufficient evidence on issues for which he bears the burden of proof as would permit the jury to find in his favor.

Were we to adopt Dr. Ganti's reasoning, it would also follow that he could argue his own untruthfulness to the jury. His admission under oath is no less an admission because it was oral. It is no less an admission because made during cross-examination. Once made, it is no different from any other type of admission.

The court's charge clearly left the crucial *disputed* issue of causation to the jury. The jury were given the usual instructions regarding professional negligence and liability. (TT, vol. II, pp. 301, l. 23 through 306, l. 20.) They were then told that Dr. Ganti was negligent as a matter of law (TT, vol. II, p. 306, ll. 21-24) and they were reminded of what had been instructed previously, that it was left for them to determine whether Dr. Ganti's negligence was a substantial factor in bringing about the harm. (TT, vol. II, p. 397, ll. 12-14.) In addition, the interrogatories the jury answered also clearly left causation and liability for them to decide.

As to plaintiff's claim against HealthAmerica, the court implicitly ruled as a matter of law that this failure by Dr. Ganti also constituted a material breach of HealthAmerica's *contractual* duty to Mr. Renk to provide him the necessary preventive screening, a promise HealthAmerica attempted to fulfill by placing a bright yellow checklist in a highly prominent place in each patient's chart. Mr. Renk's contract with HealthAmerica *created* the separate duty in Dr. Ganti to perform a sigmoidoscopy *even if* such a screening test were not required by the ordinary standard of care. That contract also created the *direct* duty in HealthAmerica to set up procedures that would assure that its employees, such as Dr. Ganti, performed in accordance with the contract.

As previously indicated, the *vicarious* liability of HealthAmerica was undisputedly based on the liability or not of Dr. Ganti. Since the jury found Dr. Ganti liable to both plaintiffs, HealthAmerica is vicariously liable to plaintiffs based on the law of agency. [4] The jury found in favor of HealthAmerica on the issue of its *direct* liability (a/k/a corporate negligence), probably because of the brightly colored and highly visible checklist which Dr. Ganti nevertheless admittedly ignored.

### (2) *The Court Properly Excluded Portions of Dr. Karen F. Kuhns' Testimony*

Dr. Karen F. Kuhns was a physician employed by the U.S. Steel Division of USX. Her testimony was by videotape and was proffered as a part of Dr. Ganti's case. The discussion of objections regarding her testimony is located in volume IA of the transcript at pp. 610-29 and volume II of the transcript at pp. 33-38.

Plaintiff objected that although Dr. Kuhns testified that (in plaintiff's counsel's words) "at some point in time, at U.S. Steel, they began to offer preventive physical exams to non-management people." (TT vol. IA p. 611 ll. 3-4.) Dr. Kuhns testified that she didn't know when that occurred or how the employees became aware that the screening was being offered. Plaintiff objected to the line of questions following that, saying that it was unfair to have Dr. Kuhns testify to things she didn't have knowledge of. Plaintiff's counsel said he had information that the program did not start until 1994. Dr. Ganti's counsel, on the other hand, observed that Dr. Kuhns was a treating physician not in his control, and that he was there-

---

4. Penn Group also would be vicariously liable for Dr. Ganti's conduct.

fore not permitted to speak to her prior to her deposition.

We excluded that line of questions, stating: "And so the question is whether Dr. Ganti did or did not advise plaintiff, Mr. Renk, that he ought to have a sigmoidoscopy. It is not whether USX offered it or didn't offer it back in 1991 through 1994 or 1995. Even if they had, if he didn't have the screening then that doesn't exonerate Dr. Ganti at all. So I don't see that that is relevant and I'm happy to rule that way and stick by that ruling." (TT, vol. IA, pp. 619, l. 21-620 l. 2.) And in a later discussion, "The reason for my ruling is that the questions refer to the possibility of invitations to preventive services being given to non-management personnel such as the plaintiff as early as 1991, when this witness had previously testified she knows nothing about when they were offered to non-management personnel. And, in fact, her answer on page 56 is she would presume that, yes. And a presumption is not knowledge and is consistent with her other testimony that she knows nothing about when non-management personnel were offered this before 1994 and 1995." (TT, vol. II, p. 36, l. 19-p.37 l. 5.)

(3) *The Court Properly Refused To Admit Copies of Magazine Articles Where the Sole Purpose of the Offer Was To Prove Mr. Renk's Contributory Negligence, Where the Magazines Themselves Had a General Caveat About Reliance on Their Articles, and Where There Was No Other Evidence That Mr. Renk Himself Had Ever Been Told by Any Defendant To Arrange Screening Himself*

This issue was discussed at various times during the trial, most thoroughly at TT, vol. I, p. 257, l. 25 through

p. 266, 1.13, which contains the ruling of which Health-America complains. HealthAmerica sought to have admitted into evidence copies of articles in various issues of the periodical it sent to all the patients it served. Counsel for HealthAmerica offered the magazine articles "to show that HealthAmerica takes certain steps to ensure that these preventative [sic] medicine services are delivered. . . . (TT, vol. I, p. 259, ll. 23-25.) As counsel for plaintiff pointed out, the same magazines have a kind of disclaimer saying "these guidelines are for your general information only and your primary care physician will let you know exactly what preventive checkups and diagnostic tests are suitable for you as well as offering them."

The relevance asserted by HealthAmerica was to the issue of its *direct* liability. The court sustained plaintiffs' objection. Even if the ruling were erroneous, which the court respectfully suggests it is not, there is no harm to HealthAmerica, because the jury found in its favor on the issue of direct liability.

As to Dr. Ganti, there was no objection made on his behalf to the ruling referenced above, nor was there any contention during that discussion that the articles were relevant as to Dr. Ganti's defense. Assuming Dr. Ganti properly raised the issue at some other point in the proceedings, it seems clear that a patient cannot be contributorily negligent for seeking medical care from his doctor rather than from magazine articles.

### (4) *The Court Properly Took Judicial Notice of the Life Tables and Properly Instructed the Jury on Their Use*

At trial, during the in-chambers discussion of the charge, Dr. Ganti's counsel objected to the introduction of life expectancy tables as to Mr. Renk, because plaintiffs' expert had testified that Mr. Renk's life expectancy was limited, and as to Mrs. Renk, "because that is not an issue. Her claim is for loss of consortium." (TT, vol. II, p. 199, ll. 3-5.)

We included the reference to the life expectancy tables in the instructions because the jury needed to know both plaintiffs' normal life expectancy in order to calculate their damages. As pointed out in the note to no. 6.21 of the Pennsylvania Suggested Standard Civil Jury Instructions, the Pennsylvania Supreme Court has "specifically approved" the life expectancy tables. The note also clearly states that there is no need for them to be offered by the plaintiff. In other words, the tables are proper subjects of judicial notice. It would have been error not to charge the jury on them.

In the instruction given in this case, we properly cautioned the jury that plaintiffs' own expert testified that Mr. Renk's life expectancy had been significantly shortened. We also instructed the jury that they were "to consider [both plaintiffs'] health, their manner of living, their personal habits, and other factors that might also affect the duration of their life." (TT, vol. II, p. 311, ll. 2-4.)

### (5) *It Was Not Error To Permit Rebuttal Testimony From Mr. Thomas Lauritzen.*

Mr. Thomas Lauritzen, a human resources manager for U.S. Steel, was called by plaintiff as of rebuttal after the defense rested. The discussion regarding his testimony is in transcript volume II, pp. 126-29. His testimony was proffered to show that it was only after 1994 that physical exams were offered to non-management employees. Dr. Ganti's counsel contended that Mr. Lauritzen should have been called during the plaintiffs' case in chief and that his testimony was cumulative. The court concluded that the testimony was proper for rebuttal, because during the plaintiffs' case in chief there was no dispute as to this issue, and the dispute as to this issue did not arise until the jury heard Dr. Kuhns' testimony in the course of defendants' case.

### (6) *The Court Properly Excluded the Testimony of Dr. John Durocher on the Growth Rate of Tumors*

The discussion regarding Dr. Durocher is located in volume IA of the transcript at pp. 463-76. Dr. Durocher was an expert witness for HealthAmerica. The plaintiff objected to Dr. Durocher testifying as to the growth rate of tumors because that was not mentioned in his report. The plaintiff also objected that an expert should not be permitted to read and cite literature or articles as a part of their testimony. The court ruled:

"The Court: He can certainly talk about his own experience. He can't get into the area of doubling [rates of cancer]. And I don't view it ['doubling'] as a magical word, okay. So he can't get into the items that [are] cov-

ered solely by Dr. Ostrum's report with regard to the doubling. In other words, he is not to be a substitute for Dr. Ostrum.

"[Counsel for HealthAmerica]: But he can testify, I will propose, to the basis for his opinions.

"The Court: Yes, his own, if it is truly the basis of his opinion, he can. But he can't describe all the other research or get into it. Unless he has done it himself." (TT, vol. IA, p. 474, l. 17-p. 475, l. 3.)

The reason for the ruling was the prejudice to plaintiff given the fact that defendants (who were represented by one attorney until two months prior to the trial) decided to withdraw Dr. Ostrum as an expert rather than comply with an order of Judge Strassburger directing Dr. Ostrum to supply certain financial information. Dr. Ostrum's report extensively discussed growth rates, while Dr. Durocher's report barely alluded to "growth" at all and to "rates," doubling or otherwise, not at all. Defendants attempted to circumvent Judge Strassburger's order. It was not error to prevent this.

Furthermore, Dr. Ostrum said that metastases grow faster than the primary tumor, and it would have increased unfairly the prejudice to plaintiff to let Dr. Durocher say what was not covered by his report, and what Dr. Ostrum himself had denied.

### (7) *The Two Schools of Thought Doctrine Does Not Apply to the Facts of This Case*

HealthAmerica, in its proposed point for charge no. 14, sought to have the jury instructed about the Two Schools of Thought Doctrine. The discussion of this is in transcript volume II, pp. 184-89. Based on testimony

of Dr. Richard Bruehlman, a family physician who testified as part of HealthAmerica's case, HealthAmerica's counsel argued to the court that there was more than one school of thought as to how HealthAmerica could properly permit its physicians to practice medicine with regard to whether it is the physician or the patient who has the responsibility to schedule screening or preventative examinations. Dr. Bruehlman testified:

"Dr. Bruehlman: There are two schools of thought at least on preventive medicine and the approach to preventive medicine. I think the more traditional view has been that doctors have asked the patients to have scheduled their own preventive maintenance or health checkups. You can think of it as a complete physical, going to your doctor for the complete physical examination.

"At that point generally there is extra time scheduled as opposed to a sore throat or earache visit where the history and physical examination is done and a plan is set up for preventive health care throughout the next— be it month or several years.

"The other school of thought, which is more recent, is that you try to do it periodically as people come to the office for other things, although I think this has really been a focus that's been going on more for the last couple of years than a longer term." (TT, vol. IA, p. 552 ll. 7-23.)

The leading case on the doctrine is *Jones v. Chidester*, 531 Pa. 31, 610 A.2d 964 (1992). In *Jones,* the Pennsylvania Supreme Court defined the doctrine as follows: "Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of *treatment* advo-

cated by a considerable number of recognized and respected professionals in his given area of expertise." 531 Pa. at 40, 610 A.2d at 969. (emphasis added)

We refused to charge the jury on the doctrine because we concluded that HealthAmerica's policies should be assessed based on the two standards of care that were applicable to it: (1) what was reasonable under the circumstances, and (2) its contractual promise to defendant. Furthermore, the doctrine only applies to physicians, not to HMOs such as HealthAmerica. Lastly, the policy, as defined by the Supreme Court above, applies to courses of *treatment,* not to whether or not *preventive screening* should take place.

### (8) *The Asserted Instances of Error*
### *Did Not Result in an Excessive Verdict*
### *the Trial Was Fairly Conducted*

As discussed above, the court's rulings complained of were not erroneous. In addition, the testimony regarding the extraordinary suffering and grace of both plaintiffs was especially compelling. The jury had ample evidence from which to find that Mr. Renk's life had been tragically affected both in quality and duration. They also had ample evidence from which to conclude that Mrs. Renk's loss of consortium claim was sincere and substantial. The evidence was overwhelming that she and her husband had an exceptionally loving marriage.

### PLAINTIFFS' MOTION FOR DELAY DAMAGES

The plaintiffs also filed a motion to mold the verdict and add delay damages. Plaintiffs' counsel indicated at oral argument that plaintiffs would accept defendants'

118

calculation of delay damages; the court's notes indicate that the parties agreed that delay damages in the amount of $595,000 would be added to the award to Mr. Renk.

## CONCLUSION

The defendants' motion must be denied. As to plaintiffs' motion for delay damages, it must be granted and the award for Mr. Renk increased by $595,000.

## ORDER

And now to wit, December 19, 2000, it is hereby ordered that the motion for post-trial relief of defendants Murty S. Ganti M.D. and Penn Group Medical Associates Inc., and the motion for a new trial of defendant HealthAmerica Corporation of Pennsylvania, d/b/a HealthAmerica be and hereby are denied.

It is further ordered that plaintiffs' motion to mold the verdict and motion to add delay damages be and hereby is granted, and the verdict is hereby molded to add $595,000 to the award to Robert G. Renk.

It is further ordered that judgment be and hereby is entered against all defendants and in favor of plaintiff Robert G. Renk in the amount of $4,220,000 and against all defendants and in favor of plaintiff Roberta P. Renk in the amount of $1,650,000.